1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Samantha DeVilbiss,                    No. CV-23-0387-TUC-AMM (EJM)

10                   Plaintiff,

11    v.                                    **REPORT AND RECOMMENDATION**

12    Martin O'Malley,[1]
      Commissioner of Social Security,
13
                    Defendant.
14

15          Currently pending before the Court is Plaintiff Samantha DeVilbiss's Opening Brief

16    (Doc. 19).  Defendant filed his Answering Brief ("Response") (Doc. 21), and Plaintiff

17    replied ("Reply") (Doc. 22).  Plaintiff brings this cause of action for review of the final

18    decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g).  Compl.

19    (Doc. 1).

20          Pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure,[2] this matter

21    was referred to Magistrate Judge Markovich for Report and Recommendation.  Based upon

22    the pleadings of the parties and the administrative record submitted to the Court, the

23    Magistrate Judge recommends that the District Judge REVERSE and REMAND the

24    decision of the Commissioner.

25    _____

26          [1] The Court takes judicial notice that Kilolo Kijakazi is no longer Acting Commissioner of
      the Social Security Administration ("SSA").  The Court will substitute the new Commissioner of
27    the SSA, Martin O'Malley, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil
      Procedure.  *See also* 42 U.S.C. § 405(g).
28
            [2] Rules of Practice of the United States District Court for the District of Arizona.

# I.     BACKGROUND

### A.     *Procedural History*

This cause of action follows a previous federal case in which the Parties stipulated remand to the Commissioner.  *DeVilbiss v. Kijakazi*, No. CV-21-00075-TUC-SHR (LAB), Order Granting Stipulated Mot. to Remand (D. Ariz. Jan. 25, 2022), ECF No. 33.  On March 15, 2022, the Appeals Council issued its order vacating the final decision of the Commissioner and remanding the matter to an Administrative Law Judge ("ALJ") for further consideration and development of the record, including an additional hearing, to address shortcomings in the ALJ's prior analysis of the severity of claimant's mental impairments and evaluation of the medical source opinions.  *See* Administrative Record ("AR") at 2036, 2041–45.[3]  Plaintiff's applications prior to remand included a Title II application for Social Security Disability Insurance Benefits ("DIB"), as well as a Title XVI application for Supplemental Security Income ("SSI") alleging disability beginning March 20, 2018, due to multiple back injuries, severe pain, arthritis, hypertension, high cholesterol, incontinence, severe mental illness, bipolar disorder, depression, anxiety, and post-traumatic-stress disorder ("PTSD").  *See id.* at 25, 28, 50, 78–79, 95–96, 112, 114–15, 132–33, 150–51, 167–68, 184–85, 260, 289, 306, 335, 337, 1698, 1700, 1713, 1757, 1781–82, 1795–96, 1816, 1829–30, 1993, 2000.  While the previous federal case was pending, Plaintiff filed subsequent Title II and Title XVI applications.  *See id.* at 1735, 2045.  These later applications were considered duplicates of Plaintiff's original claims and consolidated with them on remand.  *Id.*  On November 28, 2022, following remand, a telephonic hearing was held before ALJ Yasmin Elias.  *Id.* at 1697, 1723–53.  On December 19, 2022, the ALJ issued an unfavorable decision.  *Id.* at 1639–47, 1694–1713.  On January 18, 2023, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on June 30, 2023, review was denied.  *Id.* at 1621–27, 1631–38, 1939–43.  On August 17, 2023, Plaintiff filed this cause of action.  Compl. (Doc. 1).

---

[3] Page numbers refer to the page numbers demarcated in the Administrative Record rather than the Court's Case Management/Electronic Case Files ("CM/ECF") page numbers.

1

     **B.**    ***Factual Background[4]***

2

     Plaintiff was thirty-five (35) years old at the time of the alleged onset of her

3

disability and forty (40) years old at the time of the administrative hearing on remand. AR

4

at 25, 28, 36, 50, 78–79, 95–96, 112, 114–15, 132–33, 150–51, 167, 184, 251, 260, 306,

5

335, 337, 1658, 1661, 1677, 1680, 1683, 1686, 1712, 1723, 1781–82, 1795–96, 1816,

6

1829–30, 1946. Plaintiff completed high school, as well as two years of college. *Id.* at 36,

7

92, 110, 112, 129, 147, 165, 182, 184, 290, 1712, 1781, 1795, 1829, 1994. Prior to her

8

alleged disability, Plaintiff worked as a line cook, server, and car salesperson. *Id.* at 68,

9

92, 109, 129, 147, 164–65, 181–82, 290, 1981–91.

10

     **1.**  **Plaintiff's Medical Treatment Records[5]**

11

     Beginning in 2011, Plaintiff was treated by Austin Allen Gentry, DC, PT for

12

ongoing left low back pain and left leg radiation due to a rear-end automobile collision in

13

September 2010. AR at 358–80. Beginning in March 2014 through the beginning of 2018,

14

Plaintiff sought treatment from Gary A. Love, DC for neck, mid- and low-back pain. *Id.*

15

at 590–749. On October 9, 2015, Plaintiff underwent spinal surgery including a posterior

16

thoracolumbar laminectomy and discectomy and a posterior bilateral L4/L5 discectomy.

17

*Id.* at 390–98, 535–36. On November 19, 2015, Plaintiff had her six (6) week follow-up

18

with her surgeon, Brian P. Callahan, M.D., and reported that she still had some back pain,

19

but it was improving and she no longer had pain or numbness down her legs. *Id.* at 458,

20

500–501.

21

     On November 22, 2017, Plaintiff was seen by Efrain L. Cubillo, M.D. at the Pain

22

Institute of Southern Arizona for an initial consult. *Id.* at 473–77, 868–77. Plaintiff

23

---

24

    [4] Plaintiff's Opening Brief raises a single issue for review, alleging that "[t]he ALJ's [a]nalysis of [o]pinion [e]vidence [i]s [n]ot [b]ased upon [s]ubstantial [e]vidence." Opening Br.

25

(Doc. 19) at 2, 5–10. As such, the Court has focused its factual background on Plaintiff's medical records, including Plaintiff's examination by Consultative Examiner Jeri B. Hassman, M.D. and

26

her report. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (the Court will only review issues raised by Plaintiff in her opening brief).

27

    [5] Although the Court has reviewed the entirety of Plaintiff's medical records, its summary

28

is generally limited to records subsequent to her alleged onset date and related to her back pain with radiation into her legs.

1    presented with mid- to low-back and leg pain.  AR at 473, 868.  Plaintiff reported that she

2    had seen Dr. Callahan and was told she was not a surgical candidate.  *Id.*  Plaintiff's

3    lumbosacral spine exhibited severe tenderness with palpation.  *Id.* at 475, 870.  Plaintiff

4    also had a positive straight leg test on the left and abnormal knee jerk reflexes.  *Id.*  After

5    establishing care, and prior to her alleged onset date, Plaintiff began treating regularly at

6    the Pain Institute.  *Id.* at 849–67.

7        On March 1, 2018, Plaintiff saw Gary A. Love, DC for an adjustment.  AR at 600–

8    01.  Plaintiff complained of moderate neck and mid-back pain, as well as severe low back

9    pain.  *Id.* at 601.  On March 13, 2018, Plaintiff returned to Dr. Cubillo for re-evaluation.

10   *Id.* at 837–40.  Dr. Cubillo discussed the spinal cord stimulator trial with Plaintiff, who

11   expressed concern regarding diaphoresis and the dressing during the trial because she

12   worked in a kitchen as a chef.  *Id.* at 837, 840.  Dr. Cubillo increased Plaintiff's oxycodone

13   by an extra tablet per day due to her reports of increased pain.  *Id.* at 840.  On March 29,

14   2018, Plaintiff returned to Dr. Love.  AR at 598–99.  Dr. Love's treatment records were

15   generally unremarkable.  *Id.* at 598.  Plaintiff reported moderately severe neck pain,

16   moderate mid-back pain, and severe low back pain.  *Id.* at 599.  On March 30, 2018,

17   Plaintiff was seen at Tucson Medical Center ("TMC") for a head injury with back and arm

18   pain after being kicked by a horse.  *Id.* at 389–90, 408–18.  Computerized tomography

19   ("CT") scans of Plaintiff's cervical spine on the same date showed "[m]ild degenerative

20   changes throughout the cervical spine[,] . . . [but] no disc protrusion or cord compression,

21   with mild multilevel foraminal narrowing."  *Id.* at 532–33.

22       In April 2018, Plaintiff was seen three (3) times by Dr. Love regarding her moderate

23   neck and mid-back pain, as well as severe low back pain.  AR at 590–95.  Early treatment

24   records reflect pain on active ranges of motion, as well as limitation of motion.  *Id.* at 594.

25   Subsequent records indicate that Plaintiff did not exhibit any apparent distress.  *Id.* at 592.

26   On April 3, 2018, Plaintiff saw Sylvia P. Valenzuela, FNP-C at the Pain Institute of

27   Southern Arizona for a medication check.  *Id.* at 831–34.  NP Valenzuela continued

28   Plaintiff's pharmacotherapy without modification.  *Id.* at 834.  On April 20, 2018, Plaintiff

was seen by Dr. Cubillo for placement of a trial spinal cord stimulator.  AR at 826–28.  The procedure was unremarkable and well-tolerated.  *Id.* at 827–28.  On April 25, 2018, Plaintiff returned to Dr. Cubillo following a trial spinal cord stimulation.  *Id.* at 823–25.  Plaintiff reported 50–75% relief while using the spinal cord stimulator.  *Id.* at 823–24.  Dr. Cubillo removed the spinal cord stimulator leads without incident.  *Id.* at 824.

On May 4, 2018, Plaintiff returned to NP Valenzuela for a medication check.  AR at 819–22.  Review of Plaintiff's systems was generally unremarkable, but noted neck pain and stiffness, cough, numbness and tingling, and muscle tenderness.  *Id.* at 821.  NP Valenzuela continued Plaintiff's pharmacotherapy unchanged.  *Id.* at 822.  On May 15, 2018, Plaintiff saw Dr. Callahan regarding a permanent spinal stimulator.  *Id.* at 485–86, 495–96, 2239–49.  Treatment records reflect that Plaintiff "had a microdiscectomy and did well in the past but has since been in multiple car accidents[,] . . . [and] now has chronic low back pain and leg pain." *Id.* at 485, 495, 2239.  Dr. Callahan's physical examination of Plaintiff was unremarkable and his assessment included failed back surgical syndrome.  AR at 485, 495, 2239.  On May 30, 2018, Plaintiff was seen at Tucson Medical Center ("TMC") for a thoracic laminotomy and implantation of a permanent spinal cord stimulator.  *Id.* at 382–89.  Treatment records reflect that Plaintiff tolerated the procedure well.  *Id.* at 384.

On June 6, 2018, Plaintiff saw NP Valenzuela for a medication check.  *Id.* at 815–18.  Plaintiff reported that she had a permanent spinal cord stimulator placed six (6) days prior and was in a lot of pain.  *Id.* at 815.  Plaintiff's pharmacotherapy was continued unchanged.  AR at 818.  On June 14, 2018, Plaintiff saw Dr. Callahan for her two (2) week follow-up after surgery.  *Id.* at 482, 493–94.  Plaintiff reported continued pain and muscle spasms following surgery.  *Id.* at 482, 493.  The stimulator was programmed and Plaintiff reported being pleased with the results.  *Id.*  On the same date, Plaintiff saw NP Valenzuela for a medication check.  *Id.* at 812–14.  NP Valenzuela noted Plaintiff suffered from a mild to moderate level of pain and was able to perform her previous occupation without restrictions.  AR at 813.  Treatment records reflect a generally unremarkable review of

1    Plaintiff's systems, but positive for neck pain and stiffness, some tingling and numbness,

2    as well as muscle tenderness.  *Id.*  Plaintiff's physical examination was unremarkable.  *Id.*

3    Plaintiff's pharmacotherapy remained unchanged.  *Id.* at 814.  On June 14, 2018, Plaintiff

4    returned to Dr. Callahan for a follow-up regarding her spinal cord stimulator placement.

5    *Id.* at 2237–38.  Plaintiff reported "lots of muscle spasms and pain from surgery."  AR at

6    2237.  Dr. Callahan spent time programming the stimulator with Plaintiff, and she reported

7    being pleased with the results.  *Id.*

8         On August 7, 2018, Plaintiff was seen at Chiricahua Community Health Centers,

9    Inc. in Bisbee, Arizona for Chronic Pain Management.  *Id.* at 448–54, 562–68.  Plaintiff

10   reported that she had lost her job and insurance and had moved to Bisbee for financial

11   reasons.  *Id.* at 448, 562.  Depression screening was positive for mild depression.  *Id.* at

12   449, 563.  Review of Plaintiff's systems was generally unremarkable, but positive for

13   anxiety and depression, as well as back, neck, and joint pain.  AR at 451, 465.  Plaintiff

14   reported pain as 8/10.  *Id.* at 452, 566.  Plaintiff's physical examination was generally

15   unremarkable, but showed an antalgic gait, and severe pain with motion in her lumbar

16   spine.  *Id.*  Plaintiff received a prescription refill of her pain medication.  *Id.*  On the same

17   date, Plaintiff was discharged by Sylvia P. Valenzuela, FNP-C at the Pain Institute of

18   Southern Arizona.  *Id.* at 456, 809–10.

19        On September 18, 2018, Plaintiff was seen at Chiricahua Community Health Center

20   for depression associated with chronic pain.  *Id.* at 556–61, 765–75.  On September 27,

21   2018, Plaintiff returned to Chiricahua Community Health Centers for chronic pain

22   management and cold symptoms.  AR at 549–55.  Plaintiff was given a refill of her pain

23   medication as a bridge until she could see pain management.  *Id.* at 553.

24        On October 18, 2018, Plaintiff followed-up with Dr. Callahan.  *Id.* at 491–92, 1470–

25   71, 2235–36.  Plaintiff reported that "the stimulator treat[s] her neuropathic leg pain very

26   well[;] [h]owever[,] it does not help her chronic low back pain."  *Id.* at 491, 1470, 2235.

27   Dr. Callahan observed that the stimulator seemed to be helping her legs but not her low

28   back pain and required x-rays to check the stimulator's position.  *Id.*  On the same date,

1    Plaintiff had radiographs of her thoracic spine taken.  AR at 2241.  Radiographs confirm

2    an "intraspinal nerve stimulator device entering the spinal canal at T9-T20 and extending

3    superiorly to T6-T7." *Id.*  On October 30, 2018, Plaintiff was seen by Melba Travis, FNP-

4    BC at Chiricahua Community Health Center for chronic pain management.  *Id.* at 542–48.

5    Plaintiff reported persistent pain in her lower back, legs, and neck at a level of 7/10.  *Id.* at

6    542, 546.  NP Travis's physical examination of Plaintiff indicated moderate distress, ill

7    appearance, vesicle lesion on her left shoulder, antalgic gait, and severe pain with motion

8    in her lumbar spine.  *Id.* at 546.

9        On November 14, 2018, Plaintiff returned to Dr. Cubillo for reevaluation.  AR at

10    804–808.  Plaintiff reported low back and leg pain.  *Id.* at 804.  Plaintiff further reported

11    that her leg pain was significantly improved after implantation of a spinal cord stimulator;

12    however, she continues to have lower back pain.  *Id.*  Plaintiff indicated her pain level was

13    7/10.  *Id.*  Dr. Cubillo's physical examination of Plaintiff was unremarkable.  *Id.* at 806–

14    807.  Lumbar medial branch blocks were discussed.  AR at 807.

15        On December 7, 2018, Plaintiff was seen by Dr. Cubillo for a bilateral lumbar

16    medial branch block.  *Id.* at 801–803.  Plaintiff tolerated the procedure well.  *Id.* at 802–

17    803.  On December 12, 2018, Plaintiff returned to Dr. Love for treatment.  *Id.* at 596–97.

18    Dr. Love noted that Plaintiff did not show any apparent signs of distress.  *Id.* at 596.

19    Plaintiff indicated that her spinal cord stimulator had been placed, but she continued to

20    have moderate neck pain and stiffness.  AR at 597.  On the same date, Plaintiff returned to

21    NP Valenzuela for a medication check.  *Id.* at 796–800.  Plaintiff reported 80–100% pain

22    relief from a lumbar medial branch block injection the previous week.  *Id.* at 796.

23    Treatment records reflect mild to moderate levels of pain and the Plaintiff was able to

24    perform her previous occupation without restriction.  *Id.* at 797.  On December 28, 2018,

25    Plaintiff saw Dr. Cubillo for a lumbar medial branch block.  *Id.* at 793–95.  Plaintiff

26    reported "greater than 80% relief of the pain for several hours" following lumbar medial

27    branch blocks at her prior visit.  AR at 795.  Dr. Cubillo noted that if Plaintiff "gets similar

28    results, the patient will be a candidate for lumbar facet rhizotomy." *Id.*  The procedure was

1    performed without incident.  *Id.* at 794.

2        On January 18, 2019, Plaintiff returned to NP Valenzuela for a medication check.

3    *Id.* at 1014–21.    NP Valenzuela continued Plaintiff's pharmacotherapy without

4    modification.  *Id.* at 1017.  On January 21, 2019, Plaintiff was seen by Dr. Cubillo for

5    bilateral lumbar radiofrequency rhizotomy.  AR at 1008–11.  The procedure was performed

6    without complication and was well-tolerated.  *Id.* at 1009–10.  On January 28, 2019,

7    Plaintiff reported approximately 30% relief from the procedure.  *Id.* at 1012.  On February

8    18, 2019, Plaintiff saw NP Valenzuela for a medication check.  *Id.* at 1000–1007.  NP

9    Valenzuela continued Plaintiff's pharmacotherapy without modification.  *Id.* at 1003.

10        On March 4, 2019, Plaintiff followed-up with Dr. Cubillo.   AR at 989–96.

11    Treatment records reflect that Dr. Cubillo performed bilateral radiofrequency ablation on

12    Plaintiff on January 21, 2019, and she reported approximately 80% relief of her low back

13    pain, but continued to have pain in the area of her sacroiliac joints.  *Id.* at 989.  Plaintiff

14    requested Dr. Cubillo fill out disability paperwork; however, did not feel comfortable

15    without a full day examination on what she can and cannot do and referred her to his

16    colleague Karen Lunda for evaluation.  *Id.* at 992.   Dr. Cubillo continued Plaintiff's

17    pharmacotherapy without modification.  *Id.*  On March 19, 2019, Plaintiff saw Nichole

18    Laux, FNP-C at the Pain Institute of Arizona for a medication check.  *Id.* at 983–88.  NP

19    Laux continued Plaintiff's pharmacotherapy without modification.  AR at 988.  On March

20    25, 2019, Plaintiff returned to Dr. Cubillo for a sacroiliac joint injection.  *Id.* at 975–78.

21    The procedure was uneventful and well-tolerated.  *Id.* at 976–77.

22        On April 2, 2019, Plaintiff indicated that she did not experience any relief from the

23    sacroiliac joint injection.  *Id.* at 979.  On April 8–9, 2019, Plaintiff saw Karen Lunda, M.S.,

24    P.T. for evaluation.  *Id.* at 1022–37, 1596–1611.  Ms. Lunda reported that Plaintiff was

25    "above average for grip strength for women her age as well as above average with fine

26    motor testing."  AR at 1022, 1596.  Ms. Lunda further observed that Plaintiff "self-limited

27    on the lifts and carries and because of the degree of emotion she was not pushed on either

28    day[,]" and posited that Plaintiff's true safe maximum was not reached for all test items.

*Id.* Ms. Lunda reported that Plaintiff "scored 80 % on the Oswestry low back pain scale which measures the client's perception of their abilities[,] [and] . . . falls in the category of crippled (61-80%) which is defined as 'back pain impinges on all aspects of the patient's life[,] [p]ositive intervention is required.'" *Id.* at 1023, 1597. Ms. Lunda observed that "[o]n some tests [Plaintiff] scored above average . . . and others she self-limited." *Id.* at 1024. Ms. Lunda further noted that "[b]ecause of the level of emotion she was not pushed on either day and testing was stopped based on what she thought she could do[,]" which is "a psychophysical approach [and] not the normal kinisiophysical approach used in the Workwell FCE." *Id.* at 1024.

Ms. Lunda reported that Plaintiff "ambulates with a very stiff and rigid gait pattern." AR at 1026. Ms. Lunda noted that when standing with her shoes off, Plaintiff's right iliac crest is slightly higher than the left, and she had a decrease in her lumbar curvature when viewed from the side. *Id.* at 1027. Plaintiff exhibited gross coordination within normal limits and was able to assume and maintain unilateral standing balance for ten (10) seconds bilaterally. *Id.* Ms. Lunda reported Plaintiff "was limited in hip flexion with the knee flexed to 100° bilaterally during physical exam[,] [but] [f]ull hip flexion was noted during the floor to waist lift later in the evaluation. *Id.* When Plaintiff to bent over with her fingertips toward the floor, she bent at the hip with minimal movement in the lumbar spine. *Id.* Additionally, she exhibited 50% of gross motion and reported increased low back pain on extension. AR at 1027. Plaintiff also exhibited very limited rotation at approximately 25% of motion bilaterally. *Id.* at 1027.

Under Manual Muscle Testing, Ms. Lunda observed that Plaintiff "performs a fair contraction of her abdominal musculature which produces mild elicitation of the lumbar trunk extensors." *Id.* Ms. Lunda further observed that when "asked if she could suck her belly button in toward her spine[,] [Plaintiff] stated this caused tightness in the muscles in the mid back area where she experiences the spasms (mid and lower thoracic area)." *Id.* Ms. Lunda reported that Plaintiff experienced spasming in the mid-back with hip extension on the left. *Id.* As a result, Plaintiff "transitioned to supine hook-lying[,] [and] [a]fter 3

minutes, she stated she felt a pop which released the spasm." AR at 1028. Ms. Lunda inquired how often this occurred, and Plaintiff reported daily, estimating it occurs between three (3) and six (6) times per day. *Id.* Ms. Lunda indicated that Plaintiff was able to perform ten (10) toe raises on the right and left, with greater difficulty on the right which Plaintiff reported caused increased low back pain. *Id.* Ms. Lunda noted that Plaintiff was initially able to achieve 115° of knee flexion when squatting, but was instructed to stand back up "as there was some quivering on the lower extremities." *Id.* Plaintiff was subsequently able to "assume[] a full squat and returned back up to standing." *Id.* A similar pattern was repeated on the second day of testing. *Id.* Ms. Lunda observed that Plaintiff was able to handle ten (10) pounds safely with what was considered minimal effort. AR at 1028.

Ms. Lunda noted Plaintiff had good muscle tone in both upper and lower extremities, without signs of atrophy or edema. *Id.* Ms. Lunda observed that Plaintiff's skin over the lumbosacral area was warm to the touch. *Id.* Plaintiff denied tenderness over the greater trochanters, a little tenderness in the sacral notch bilaterally, and significant tenderness of the upper sacroiliac joint bilaterally. *Id.* Ms. Lunda further observed "a distinct change in the tone of the paraspinal musculature starting in the upper lumbar spine throughout the thoracic spine." *Id.* at 1029. Ms. Lunda described Plaintiff's lower lumbar spine muscles as soft and supple, but above this they were tight and taut on both days of testing. AR at 1029. Plaintiff reported muscle spasms on multiple occasions; however, Ms. Lunda was unable to differentiate between what she perceived as normal tightness of this musculature and the reported spasms. *Id.* Ms. Lunda noted Plaintiff reported some numbness in the upper buttock while sitting and after standing, but the numbness resolved, and sensation to light touch was otherwise within normal limits. *Id.*

Ms. Lunda described Plaintiff's reflexes as brisk and symmetric. *Id.* Ms. Lunda also observed that Plaintiff was able to remove her shoes and put them back on without difficulty. *Id.* Ms. Lunda described Plaintiff as sitting in a chair and bending forward to loosen or attach a Velcro strap. AR at 1029. Ms. Lunda observed Plaintiff initially

1   extended her right leg to 30° while seated, but stopped due to an increase in low back pain.

2   *Id*.  On a second attempt, Plaintiff was able to extend almost to full extension.  *Id*.  On the

3   left, Plaintiff extended to approximately 38° of knee extension, and then reported shooting

4   lower extremity pain down her thigh and in her calf.  *Id*.  Ms. Lunda further observed that

5   in the supine position, Plaintiff reported an increase in low back pain at 55° which increased

6   with ankle dorsiflexion.  *Id*.  This also occurred on the left.  AR at 1029.

7          Ms. Lunda opined that Plaintiff's "functional abilities and limitations were

8   consistent with her diagnoses, her past medical history and objective physical examination

9   findings."  *Id.* at 1030.  Ms. Lunda observed that Plaintiff's performance was consistent

10  among functional capacity examination items, except for floor-to-waist and waist-to-crown

11  lifts.  *Id.*  Ms. Lunda found that Plaintiff functioned at a higher level on Day Two than Day

12  One in various areas.  *Id.*  Ms. Lunda noted that Plaintiff reported significant pain, but did

13  not exhibit specific pain behaviors.  *Id.* at 1031–32.  Ms. Lunda opined that she was unable

14  to determine forward bending in a standing capacity, but was uncertain whether Plaintiff

15  self-limited in this endeavor.  AR at 1032–33.

16         On April 18, 2019, Plaintiff returned to NP Valenzuela for a medication check.  *Id.*

17  at 1449–53.  Plaintiff reported her pain level at 5/10.  *Id.* at 1449.  NP Valenzuela continued

18  Plaintiff's pharmacotherapy without modification and noted that Plaintiff was off

19  benzodiazepines.  *Id.* at 1452.  On May 21, 2019, Plaintiff saw NP Valenzuela for a

20  medication check.  *Id.* at 1441–48.  Plaintiff reported a pain level of 5/10.  AR at 1441,

21  1446.  NP Valenzuela continued to encourage increased activity, as tolerated.  *Id.* at 1444.

22  NP Valenzuela apprised Plaintiff of the practice's new guidelines which required her to

23  either wean down to 50 morphine milligram equivalents or less or stop using medical

24  marijuana.  *Id.* at 1444, 1447.  NP Valenzuela reduced Plaintiff's Xtampza ER to 9 mg

25  from 13.5 mg, continued her oxycodone, and noted that Plaintiff would continue Cymbalta

26  through her primary care physician.  *Id.* at 1444–45, 1447.  NP Valenzuela also noted that

27  Plaintiff was currently off benzodiazepines.  *Id.* at 1445, 1447.

28         On June 19, 2019, Plaintiff saw Alberto G. Corica, M.D. at Carondelet Medical

1    Group regarding her incontinence.  AR at 1157–604.  Plaintiff's physical examination was

2    unremarkable.  *Id.* at 1159.  Samples of Myrbetriq were given to Plaintiff.  *Id.* at 1160.  On

3    June 20, 2019, Plaintiff saw NP Valenzuela for a medication check.  *Id.* at 1433–40.

4    Plaintiff reported her pain as 5/10.  *Id.* at 1433, 1436.  NP Valenzuela discussed new

5    guidelines with Plaintiff.  AR at 1434, 1440.  NP Valenzuela noted that Plaintiff had been

6    using medical marijuana for her PTSD; however, because her morphine milligram

7    equivalents were greater than fifty (50), she could no longer use medical marijuana.  *Id.*

8    NP Valenzuela continued Plaintiff's Xtampza ER and oxycodone, as well as Cymbalta

9    which was managed by Plaintiff's primary care physician.  *Id.*

10        On July 3, 2019, Plaintiff returned to Dr. Corica for a follow-up.  *Id.* at 1154–57.

11    Plaintiff underwent a bladder scan.  *Id.* at 1156.  Plaintiff reported that the Myrbetriq was

12    not really working.  AR at 1156.  On July 17, 2019, Plaintiff returned to NP Valenzuela for

13    a medication check.  *Id.* at 1425–32.  Plaintiff reported her pain level at 5/10.  *Id.* at 1425,

14    1430.  Treatment records reflect Plaintiff's report that she stopped smoking marijuana on

15    November 12, 2019, and indicated that she does not want her medications to be lowered

16    further.  *Id.* at 1425–26.  Plaintiff also reported that her last cigarette was in May 2019.  *Id.*

17    at 1426.  NP Valenzuela noted that she would continue Plaintiff's Xtampza ER and

18    Cymbalta through her primary care physician.  AR at 1429, 1431.  NP Valenzuela also

19    noted that she would attempt to obtain a prior authorization for Amitiza, as well as having

20    discussed Plaintiff's blood pressure with her and directed her to speak with her primary

21    care physician.  *Id.*  On July 24, 2019, NP Valenzuela added Amitiza to Plaintiff's

22    pharmacotherapy regimen.  *Id.* at 1422–23.

23        On August 15, 2019, Plaintiff followed-up with NP Valenzuela for a medication

24    check.  *Id.* at 1411–18.  Plaintiff reported her pain level at 4/10.  *Id.* at 1411, 1416.

25    Treatment records reflect encouragement of Plaintiff to increase her activity level as

26    tolerated.  *Id.* at 1414.  NP Valenzuela reported that she allowed Plaintiff to start medical

27    marijuana, for which she had a card, discontinued the Xtampza ER, and continued

28    oxycodone.  *Id.* at 1415, 1417.  NP Valenzuela noted that Plaintiff would continue with

Cymbalta, which she received through her primary care physician. *Id.* NP Valenzuela also directed Plaintiff to speak with her primary care physician regarding her blood pressure. *Id.* On August 27, 2019, Plaintiff was seen by Alberto G. Corica, M.D. at Carondelet Medical Group for a urodynamics evaluation. *Id.* at 1150–54. Dr. Corica's evaluation noted abnormal bladder capacity and sensation, possible dysfunctional voiding, possible hypo/areflexic bladder, and possible evidence of bladder outlet obstruction. AR at 1154. Dr. Corsica assessed  unspecified urinary incontinence. *Id.*

On September 11, 2019, Plaintiff returned to Dr. Cubillo for bilateral lumbar radiofrequency rhizotomy. *Id.* at 1404–09, 1529–33. The procedure was unremarkable and well-tolerated. *Id.* at 1405–06, 1408. On September 12, 2019, Plaintiff was seen by Dr. Corica for a follow-up. *Id.* at 1148–50. Dr. Corica discussed different treatment options for her  mixed urinary incontinence and neurogenic bladder. AR at 1150. On September 18, 2019, Plaintiff saw NP Valenzuela for a medication check. *Id.* at 1395–1403. Plaintiff reported her pain level to be 7/10, but did not have any new concerns. *Id.* at 1395, 1398–99. NP Valenzuela maintained Plaintiff's current pharmacotherapy regimen. *Id.* at 1396, 1402. On the same date, Plaintiff reported that she did not experience at least 50% relief from the lumbar radiofrequency rhizotomy. *Id.* at 1410.

On October 23, 2019, Plaintiff returned to NP Valenzuela for a medication check. AR at 1385–93. Plaintiff reported her pain as 6/10. *Id.* at 1385, 1391. Treatment records continue to indicate a mild to moderate level of pain and an ability to perform her previous occupation without restrictions. *Id.* at 1386, 1391. NP Valenzuela continued Plaintiff's pharmacotherapy without modification. *Id.* at 1389, 1392. On November 20, 2019, Plaintiff saw NP Valenzuela for a medication check. *Id.* at 1376–84. Plaintiff reported her pain at 6/10. AR at 1376, 1382. NP Valenzuela noted that Plaintiff "knows we will not escalate doses" and left her pharmacotherapy plan unchanged. *Id.* at 1380, 1383. On December 16, 2019, Plaintiff returned to NP Valenzuela for a medication check. *Id.* at 1339–47. Plaintiff reported her pain as 6/10. *Id.* at 1339, 1345. NP Valenzuela continued to encourage increased activity and did not change Plaintiff's pharmacotherapy. *Id.* at

1343, 1347.

On January 22, 2020, Plaintiff saw NP Valenzuela for a medication check.  AR at 1329–38.  Plaintiff reported her pain to be 5/10.  *Id.* at 1329, 1335.  NP Valenzuela did not change Plaintiff's pharmacotherapy.  *Id.* at 1333, 1337.  On February 4, 2020, Plaintiff saw Dr. Cubillo for re-evaluation.  *Id.* at 1320–28, 1485.  Because Plaintiff was "not getting good back pain coverage from her current stimulator[,]" Dr. Cubillo discussed changing her current spinal cord stimulator to a different system.  *Id.* at 1323–24, 1328.  Dr. Cubillo did not alter Plaintiff's pharmacotherapy.  AR at 1324, 1328.  On February 20, 2020, Plaintiff returned to NP Valenzuela for continuing treatment.  *Id.* at 1089–91, 1310–18.  Plaintiff reported her pain as 5/10.  *Id.* at 1089, 1310, 1316.  Plaintiff's pharmacotherapy remained unchanged.  *Id.* at 1091, 1314.

On March 23, 2020, Plaintiff was seen by NP Valenzuela and did not report any new concerns.  *Id.* at 1086–88, 1300–1308.  Plaintiff reported her pain as 3/10.  AR at 1086, 1300, 1306.  Plaintiff's pharmacotherapy was continued unchanged.  *Id.* at 1088, 1304, 1308.  On March 24, 2020, Plaintiff was seen by Stephen Goldfarb, DO at Cochise Oncology for leukocytosis with a white count of 16,100.  *Id.* at 1285–89.  Plaintiff reported that she did not need assistance with her activities of daily living, but indicated suffering chronic back pain and fatigue.  *Id.* at 1286.  Dr. Goldfarb's review of Plaintiff's systems was generally unremarkable, except for chronic back pain, fatigue, and diarrhea.  *Id.* at 1286–87.  Plaintiff's physical examination was similarly unremarkable.  AR at 1287–88.

On May 14, 2020, Plaintiff had a videoconference appointment with Dr. Cubillo.  *Id.* at 1290–98.  Plaintiff reported her pain as 3/10.  *Id.* at 1291.  Dr. Cubillo encouraged Plaintiff to increase her activity level and continued her current pharmacotherapy regimen.  *Id.* at 1294.  On June 16, 2020, Plaintiff saw NP Valenzuela for a telemedicine appointment.  *Id.* at 2612–17.  Plaintiff's pain level was 3/10.  AR at 2613.  NP Valenzuela did not alter Plaintiff's pharmacotherapy.  *Id.* at 2616.  On July 20, 2020, Plaintiff had a telemedicine appointment with NP Valenzuela.  *Id.* at 2606–11.  Plaintiff reported her pain severity as 3/10.  *Id.* at 2607.  NP Valenzuela left Plaintiff's pharmacotherapy unchanged.  *Id.* at 2610.

On August 18, 2020, Plaintiff had a telemedicine appointment with NP Valenzuela. AR at 2598–2603.  Plaintiff reported her pain level at 3/10.  *Id.* at 2599.  NP Valenzuela did not modify Plaintiff's pharmacotherapy.  *Id.* at 2602.  On August 19, 2020, Plaintiff established care with Nathan S. Conlee, D.C. and returned on August 26, 2020, following a motor vehicle accident on August 2, 2020, in which the car which Plaintiff was driving struck a deer.  *Id.* at 2055–63, 2079–84.  Plaintiff complained of constant neck, mid-, and low-back pain, as well as headaches.  *Id.* at 2055–56, 2079.  Dr. Conlee reported that Plaintiff ambulated without assistance but exhibited restricted range of motion in bother her cervical and lumbar spine.  AR at 2056, 2079.  Dr. Conlee further noted muscle spasm and tenderness in Plaintiff's paravertebral trapezial musculature, as well as interspinous ligament tenderness at C5 and L5.  *Id.*  On August 28, 2020, Plaintiff was again seen by Dr. Conlee, who noted that her condition was improving.  *Id.* at 2085–86.  Dr. Conlee's treatment plan reflected that Plaintiff was to be seen three (3) times per week for three (3) weeks.  *Id.* at 2085.  On August 31, 2020, Dr. Conlee noted that Plaintiff was progressing as anticipated.  *Id.* at 2087.

In early September 2020, Plaintiff was treated by Dr. Conlee and continued to show improvement.  AR at 2089–92.  Then on September 8, 2020, treatment records reflect that her condition "ha[d] been exacerbated due to traveling."  *Id.* at 2093.  Dr. Conlee noted positive tests for joint dysfunction of Plaintiff's cervical, thoracic, and lumbar regions, but some improvement in her cervical and lumbar range of motion and musculature.  *Id.*  Subsequent visits indicated the Plaintiff continued to progress as anticipated.  *Id.* at 2095–98.  On September 16, 2020, Plaintiff reported increased back pain; however, Dr. Conlee noted that "[f]unctionally her spinal and joint mobility and muscle tension is improved."  *Id.* at 2099.  On the same date, Plaintiff had a telemedicine appointment with NP Valenzuela.  AR at 2591–97.  Plaintiff reported her pain level at 3/10.  *Id.* at 2592.  NP Valenzuela did not modify Plaintiff's pharmacotherapy.  *Id.* at 2591.  Records from subsequent visits with Dr. Conlee noted continuing improvement overall.  *Id.* at 2101–2106.  On September 29, 2020, Plaintiff returned to Dr. Conlee for re-evaluation.  *Id.* at

2064–71, 2107–2108.  Dr. Conlee noted Plaintiff exhibited an unrestricted range of motion of the cervical spine, although tightness was noted in the left trapezial musculature with right lateral flexion.  AR at 2064.  Plaintiff ambulated without assistance and a posture analysis did not reveal un-leveling.  *Id.*  Dr. Conlee further reported that Plaintiff exhibited a restricted range of motion of the lumbar spine in flexion and extension with pain at L5 in all ranges.  *Id.* at 2065.  Plaintiff could not perform bilateral leg raise test and had a positive Yeoman's with right testing.  *Id.*  Dr. Conlee noted tenderness and muscle spasm in the lumbar musculature bilaterally.  *Id.* at 2065.  Dr. Conlee indicated improvement in all areas. AR at 2065–66, 2107–2108.

Throughout October 2020, Dr. Conlee's treatment records reflect Plaintiff's continued improvement.  *Id.* at 2109–20.  On October 30, 2020, Plaintiff returned to Dr. Conlee for re-evaluation.  *Id.* at 2072–78.  Plaintiff exhibited an unrestricted range of motion of the cervical spine without pain.  *Id.* at 2072.  Plaintiff ambulated without assistance.  *Id.*  Dr. Conlee reported a restricted range of motion in Plaintiff's lumbar spine, with pain in the lumbar musculature at L5 in all ranges.  AR at 2073.  Plaintiff reported pain at L5 with bilateral leg raise test, Eli leg raise test, and Yeoman's.  *Id.*  Dr. Conlee noted some muscle tenderness in the sub-occipital trapezial musculature and significant tenderness in the lumbar-musculature bilaterally.  *Id.*  Dr. Conlee indicated improvement in all areas, with some issues having been resolved.  *Id.* at 2073–74.  On October 15, 2020, Plaintiff had a telemedicine appointment with NP Valenzuela.  *Id.* at 2584–90.  Plaintiff reported her pain level as 3/10.  AR at 2585.  NP Valenzuela maintained Plaintiff's pharmacotherapy.  *Id.* at 2589.  In October and November 2020, Plaintiff was seen at Chiricahua Community Health Centers regarding her hyperlipidemia.  *Id.* at 2309–24.  At these appointments, Plaintiff reported her pain to be at a 7/10.  *Id.* at 2313, 2322–23.

On December 1, 2020, Plaintiff had a telemedicine appointment with Merry A. Troupe, FNP at the Pain Institute of Southern Arizona.  *Id.* at 2575–81.  Plaintiff complained of mid- to low-back and leg pain, rating her pain at 4/10.  AR at 2575.  NP Troupe kept Plaintiff's pharmacotherapy unchanged.  *Id.*at 2580.  On December 17, 2020,

1    Plaintiff had a telemedicine appointment with NP Valenzuela. *Id.* at 2568–74. NP

2    Valenzuela did not alter Plaintiff's pharmacotherapy. *Id.* at 2573.

3    On January 12, 2021, Plaintiff saw NP Valenzuela for a telemedicine appointment.

4    *Id.* at 2561–67. Plaintiff reported her pain at a level of 6/10. AR at 2562. NP Valenzuela

5    maintained Plaintiff's pharmacotherapy. *Id.* at 2566. On January 25, 2021, Plaintiff saw

6    Nicole M. Nelson-Bridges, PA-C at the Pain Institute of Southern Arizona for removal of

7    spinal cord stimulator leads following a trial. *Id.* at 2559–60. Plaintiff reported greater

8    than 50% relief during the trial. *Id.* at 2559. On February 11, 2021, Plaintiff had a

9    telemedicine appointment with NP Valenzuela. *Id.* at 2547–53. Plaintiff reported her pain

10   at 4/10. AR at 2548. NP Valenzuela did not modify Plaintiff's pharmacotherapy regimen.

11   *Id.* at 2552. On February 25, 2021, Plaintiff saw Dennis L. Paul, PA-C at the Pain Institute

12   of Southern Arizona for removal of the leads following a trial of the Nevro Spinal Cord

13   Stimulator. *Id.* at 2537–46. Plaintiff "report[ed] 50–75% relief throughout the duration of

14   the trial." *Id.* at 2537. Plaintiff also confirmed "a decrease in pain and state[d] her quality

15   of life improved during the trial." *Id.* at 2537, 2543. Plaintiff reported a pain level of 4/10.

16   AR at 2537. From March through May 2021, Plaintiff was seen at Chiricahua Community

17   Health Centers for treatment of her diabetes, hypertension, and depression. *Id.* at 2276–

18   2308. Plaintiff reported her pain beginning at 4/10 through 7/10 during this period. *Id.* at

19   2280, 2289, 2298, 2305. On March 15, 2021, Plaintiff had telemedicine appointments with

20   Dr. Cubillo and NP Valenzuela. AR at 2526–36. Dr. Cubillo spoke to Plaintiff regarding

21   a referral to an infectious disease specialist. *Id.* at 2526. Plaintiff reported her pain to NP

22   Valenzuela as 4/10. *Id.* at 2530. NP Valenzuela maintained Plaintiff's pharmacotherapy

23   without modification. *Id.* at 2534. On April 13, 2021, Plaintiff had a telemedicine

24   appointment with NP Valenzuela. *Id.* at 2518–25. NP Valenzuela noted that Plaintiff's

25   pharmacotherapy would remain unchanged. AR at 2523.

26   On May 4, 2021, Plaintiff followed-up with Dr. Callahan. *Id.* at 2233–34, 2689–

27   90. Dr. Callahan assessed Plaintiff with failed back surgical syndrome and opined that

28   there were no further surgeries that he could perform. *Id.* Dr. Callahan further opined that

1   "[i]t [wa]s doubtful that her pain w[ould] improve to a point where she could go back to

2   her work as a chef." *Id.* at 2234, 2690. On May 6, 2021, Plaintiff was seen by Catherine

3   Azar, M.D. at Arizona Blood & Cancer Specialists. *Id.* at 2242–44. Treatment records

4   reflect that Plaintiff had "a probable benign leukocytosis and mild secondary

5   polycythemia." AR at 2242. Dr. Azar noted that "[t]here is no recommendation for further

6   followup, evaluation, or treatment[,]" and noted that both conditions may be linked to

7   Plaintiff's smoking. *Id.* On May 13, 2021, Plaintiff had a telemedicine appointment with

8   NP Valenzuela. *Id.* at 2510–17. NP Valenzuela indicated that she would continue

9   Plaintiff's pharmacotherapy unchanged. *Id.* at 2515. On May 19, 2021, Dr. Callahan

10  provided a care summary regarding his treatment of Plaintiff. *Id.* at 2339–40. Dr. Callahan

11  reported that there were no other surgical procedures that he could perform at this time,

12  and opined that Plaintiff was unable to work due to her chronic pain and "multiple other

13  medical problems[.]" AR at 2339.

14      On June 15, 2021, Plaintiff saw Kerry B. Kopecky, FNP-C at the Pain Institute of

15  Southern Arizona for a pre-operative evaluation. *Id.* at 2499–2509. This assessment was

16  in advance of placement of a new spinal cord stimulator. *Id.* at 2499, 2506. Treatment

17  records reflect a functional assessment from May 2021 showed a mild to moderate level of

18  pain, and that Plaintiff was able to perform her previous occupation without restrictions.

19  *Id.* at 2500–2501. On June 16, 2021, Plaintiff saw NP Valenzuela for a telemedicine

20  appointment. *Id.* at 2491–98. Plaintiff reported that "her medications allow her to function

21  during her days." AR at 2491. NP Valenzuela reported that she would continue Plaintiff

22  on her current pharmacotherapy. *Id.* at 2496. On June 29, 2021, Plaintiff saw NP Kopecky

23  for a lumbar support brace fitting. *Id.* at 2489–90.

24      On July 12, 2021, Plaintiff was seen by PA Paul for a follow-up after permanent

25  implantation of a Nevro Spinal Cord Stimulator. *Id.* at 2485–88. Treatment records

26  indicated that Plaintiff's "current pain regimen [wa]s working well." *Id.* at 2485. Records

27  further indicated that Plaintiff "continue[d] to have mild postoperative pain, but it [wa]s

28  well managed with prescribed analgesic." AR at 2488. On July 14, 2021, Plaintiff had a

videoconference appointment with NP Valenzuela.  *Id.* at 2476–84.  Plaintiff reported her pain at 4/10 and indicated that her medication regimen provided 30–50% relief, and "her medications allow her to function during her days."  *Id.* at 2477.  NP Valenzuela indicated that she would continue Plaintiff's current pharmacotherapy regimen, and possibly reduce following post-operative results.  *Id.* at 2482.  On July 21, 2021, Plaintiff followed up with PA Paul after a permanent implant of a Nevro Spinal Cord Stimulator.  *Id.* at 2472–75.  Treatment records reflect that "[t]he current pain regimen is working well."  AR at 2472.  PA Paul and a representative of the spinal cord stimulator company worked with Plaintiff to reprogram the stimulator for maximum effectiveness.  *Id.* at 2475.

On August 16, 2021, Plaintiff followed-up with NP Valenzuela.  *Id.* at 2744–51, 2797–2804.  Plaintiff reported her pain at 5/10.  *Id.* at 2745, 2798.  Plaintiff reported healing well from surgery; however, she was still working with the stimulator representative to find the settings that will help her back pain.  *Id.* at 2749, 2802.  NP Valenzuela did not modify Plaintiff's pharmacotherapy.  AR at 2750, 2803.  On August 17, 2021, Plaintiff was seen by PA Paul for a post-operative evaluation.  *Id.* at 2740–43.  Treatment records reflect that Plaintiff was "doing well and report[ed] no new complaints[,]" with her "current pain regimen [] working well."  *Id.* at 2740.  Treatment records further reflect that Plaintiff "ha[d] minimal postprocedural pain and [wa]s still managed with prescribed analgesic."  *Id.* at 2743.

On September 10, 2021, Plaintiff saw Marco A. Duran, M.D. at the Pain Institute of Southern Arizona.  *Id.* at 2733–39.  Dr. Duran removed Plaintiff's sutures following spinal cord stimulator placement.  AR at 2736–37.  The procedure was unremarkable and well-tolerated.  *See id.*  Dr. Duran did not modify Plaintiff's pharmacotherapy.  *Id.* at 2737.  On September 14, 2021, Plaintiff had a telemedicine appointment with NP Valenzuela.  *Id.* at 2724–32.  Plaintiff reported her pain as 4/10.  AR at 2725.  NP Valenzuela maintained Plaintiff's pharmacotherapy without alteration.  *Id.* at 2730.  On October 19, 2021, Plaintiff returned to NP Valenzuela for a medication check.  *Id.* at 2715–23.  Plaintiff reported her pain level at 4/10.  *Id.* at 2716.  NP Valenzuela did not modify Plaintiff's pharmacotherapy.

1    *Id.* at 2721.  Plaintiff indicated an interest in weaning off opioids.  AR at 2721.

2         On November 11, 2021, Plaintiff had a follow-up with NP Valenzuela.  *Id.* at 2706–

3    14.  Plaintiff reported a pain level of 4/10.  *Id.* at 2707.  Plaintiff further reported 30-50%

4    pain relief with medication, which allowed her to function.  *Id.*  Plaintiff denied stepping

5    down her oxycodone dosage.  *Id.* at 2712.  As such, NP Valenzuela did not modify

6    Plaintiff's pharmacotherapy.  AR at 2721.  On December 20, 2021, Plaintiff had a follow-

7    up with NP Valenzuela.  *Id.* at 2694–2702.  Plaintiff reported her pain level at 2/10.  *Id.* at

8    2695.  Plaintiff reported greater than 50% relief of her back pain following the Nevro spinal

9    cord stimulator implant.  *Id.* at 2699.  Plaintiff indicated that she did not need a new

10   prescription for oxycodone, because she still had pills remaining.  *Id.*  Plaintiff further

11   reported her goal to be off opioids that year.  AR at 2699–2700.  NP Valenzuela did not

12   modify Plaintiff's pharmacotherapy.  *Id.* at 2700.

13        On January 20, 2022, Plaintiff returned to NP Valenzuela for a follow-up.  *Id.* at

14   3020–28.  Plaintiff reported her pain severity at 0/10.  *Id.* at 3021.  Plaintiff reported 100%

15   relief of her back pain and indicated that she rarely needs to take a pain pill.  *Id.* at 3025.

16   NP Valenzuela noted that Plaintiff "still ha[d] 15 pills of the 40.5 pills from her last

17   [appointment,] [and] we did not prescribe at her last [appointment.]"  AR at 3025.  NP

18   Valenzuela indicated a plan to reduce the dosage of Plaintiff's oxycodone prescription and

19   posited that Plaintiff may not need to continue treatment with the Pain Institute.  *Id.*

20        On March 15, 2022, Plaintiff saw NP Valenzuela for a follow-up visit.  *Id.* at 3008–

21   16.  Plaintiff reported her pain level at 0/10.  *Id.* at 3009.  Plaintiff reported 100% relief

22   from pain with her medications.  *Id.*  NP Valenzuela reported that Plaintiff was taking one

23   (1) oxycodone per day as needed and "report[ed] more than 100% relief of back pain."  AR

24   at 3014.  NP Valenzuela did not modify Plaintiff's pharmacotherapy.  *Id.*

25        On April 19, 2022, Plaintiff had a follow-up with NP Valenzuela.  *Id.* at 2999–3007.

26   Plaintiff reported her pain level at 6/10.  *Id.* at 3000.  Plaintiff further reported complete

27   pain relief with medication which "allow her to function during her days."  *Id.*  NP

28   Valenzuela noted that "today [Plaintiff] reports more than 100% relief of back pain."  AR

at 3005.  NP Valenzuela discussed a plan to begin weaning Plaintiff down by 5 pills every 2 months, and Plaintiff agreed.  *Id.*

On May 17, 2022, Plaintiff followed-up with NP Valenzuela.  *Id.* at 2990–98. Plaintiff reported her pain level as 5/10.  *Id.* at 2991.  Treatment records reflect Plaintiff was obtaining 100% relief from pain and reported that "her medications allow her to function during her days." *Id.* at 2991, 2996.  NP Valenzuela noted that Plaintiff was taking a pain pill per day as needed, and that they discussed weaning her off.  AR at 2996.  Plaintiff agreed with the plan to "wean down by 5 pills every 1-2 months." *Id.*

On June 14, 2022, Plaintiff was seen by NP Valenzuela for a follow-up.  *Id.* at 2981– 89.  Plaintiff reported her pain level at 4/10.  *Id.* at 2982.  Plaintiff reported that "her medications allow her to function during her days." *Id.*  Plaintiff "continue[d] to report 100% relief of back pain with an occasional 'bad day[,]'" following permanent implantation of a NEVRO spinal cord stimulator.  *Id.* at 2986.  NP Valenzuela discussed weaning off opioids with Plaintiff, and she agreed.  AR at 2986.  NP Valenzuela noted the plan was to "wean down by 5 pills every 1-2 months." *Id.*

On July 21, 2022, Plaintiff retuned to NP Valenzuela for a telemedicine appointment.  *Id.* at 2969–77.  Plaintiff reported her pain level at a 4/10.  *Id.* at 2970.  NP Valenzuela noted that Plaintiff was taking her Oxycodone as needed and rarely taking Tylenol for complete pain relief.  *Id.*  NP Valenzuela further noted that "[a]t past [appointments] we have discussed weaning off and she agrees, we will wean down by 5 pills every 1-2 months[;] [a]t her last [appointment] I sent in 20 pill of her oxycodone 5/325 mg and today she has 13, no meds will be sent in today."  AR at 2975.

On August 23, 2022, Plaintiff saw NP Valenzuela for a follow-up.  *Id.* at 2960–68. Treatment records reflect that Plaintiff was "currently taking Oxycodone-apap 5-325mg PRN [(as needed)] and Tylenol 325 mg RARELY once daily for pain with 100% relief[.]" *Id.* at 2961 (emphasis in original).  NP Valenzuela further noted Plaintiff underwent "a NEVRO [spinal cord stimulator] trial and ultimately a permanent implant on 7/7/2021 and continue[d] to report 100% relief of back pain with an occasional 'bad day.'" *Id.* at 2966.

NP Valenzuela concluded that "[t]oday will be her last visit with us, she has done amazingly well[,] [s]he weaned off the oxycodone[.]"  *Id.*  Plaintiff indicated "[h]er next goal is to try and get out into the work force at least a few hours a day."  AR at 2966.

## 2.  Consultative Examiner Jeri B. Hassman, M.D.

On August 15, 2021, Jeri B. Hassman, M.D. examined Plaintiff at the request of the Arizona Department of Economic Security ("AZDES").  AR at 2618–25.  Plaintiff reported a long history of low back pain and indicated that it started in approximately 2014.  *Id.* at 2618.  Plaintiff further reported that she underwent an L4/L5 discectomy in 2015.  *Id.* Plaintiff indicated that she returned to work at "two jobs," but then was involved in two (2) motor vehicle accidents in 2017 that caused a return of her low back pain.  *Id.*  Plaintiff reviewed her history of various treatments, culminating in the insertion of a spinal cord stimulator in 2018, which was replaced in 2018.  *Id.*  Plaintiff acknowledged that the spinal cord stimulator helped her leg pain, but indicated that she continued to have severe low back pain.  AR at 2618.

Dr. Hassman's review of Plaintiff's systems noted frequent neck, mid back, and constant low back pain; occasional chest pain without shortness of breath; daily headaches; frequent constipation and occasional diarrhea; urinary urgency and frequency; and shooting pain and tingling down both legs.  *Id.* at 2619.  Dr. Hassman's physical examination of Plaintiff found:

> She ambulated with a slightly antalgic gait but without any assistive device. She said she uses a "walking stick" occasionally.  Gait was stiff, but she had normal stride length and a slightly slow gait.  She was able to stand and walk on her heels and able to stand and walk on her toes but could not hop on either foot.  She could perform almost no bending because of low back pain, and could barely reach her fingertips to her proximal thigh level.  She had normal balance for tandem walking.  She was able to perform almost a full kneel, almost to the floor, but kept her back extremely straight and erect while she performed kneeling and held on for balance.  She was independent getting in and out of the chair and independent getting on and off the examining table.

*Id.* at 2619–20.  Dr. Hassman's examination of Plaintiff's head, heart, and upper

extremities was generally unremarkable. *Id.* at 2620. Dr. Hassman noted that Plaintiff had a negative Romberg sign. *Id.* Dr. Hassman observed minimal tenderness over Plaintiff's lumbar spine and paraspinal muscles. AR at 2620. Dr. Hassman reported Plaintiff "had pain and poor lumbar range of motion[,]" her straight leg raising test was positive bilaterally at 30 degrees, and "[s]he performed a log roll in order to get up from supine position." *Id.* Dr. Hassman observed a "full range of motion of both lower extremities without pain." *Id.* Dr. Hassman's examination of Plaintiff's lower extremities was unremarkable, except for "trace bilateral knee reflexes and absent bilateral ankle reflexes." *Id.* Dr. Hassman's diagnoses included "[c]hronic low back pain and status post laminectomy and spinal cord stimulator insertion[,] . . . [with] poor lumbar range of motion, a positive straight leg raising test bilaterally, and an antalgic gait[;]" . . . "[o]besity, diabetes mellitus, hypertension, and hyperlipidemia[;]" . . . "[p]ossible obstructive sleep apnea[;]" . . . [and] [a]llegations of PTSD, depression, and anxiety." *Id.*

Dr. Hassman completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) and reiterated her diagnoses. AR at 2622. Dr. Hassman opined that Plaintiff's conditions would impose limitations for twelve (12) continuous months. *Id.* Dr. Hassman further opined that Plaintiff could occasionally lift up to ten (10) pounds and frequently lift less than ten (10) pounds. *Id.* Dr. Hassman based her opinion on Plaintiff's chronic low back pain; poor lumbar range of motion; poor bending; slightly limited kneeling; obesity; and sharp, shooting, stabbing pains down both legs. *Id.* Dr. Hassman indicated that Plaintiff would be limited in her ability to stand and/or walk to between two (2) and four (4) hours in an eight (8) hour day. *Id.* Dr. Hassman reiterated that this limitation was due to Plaintiff's chronic low back pain; poor lumbar range of motion; poor bending; slightly limited kneeling; obesity; and sharp, shooting, stabbing pains down both legs. AR at 2623. Dr. Hassman reported that Plaintiff did not use and assistive device and be able to sit for six (6) to eight (8) hours in an eight (8) hour day. *Id.* Dr. Hassman noted the same reasons for this limitation, and opined that Plaintiff "would need more frequent change of position secondary to low back pain. *Id.*

Dr. Hassman found that Plaintiff was unlimited in her ability to see, hear, and speak, as well as her ability to reach, handle, finger, and feel. *Id.* Dr. Hassman further found that Plaintiff could never climb ladders, ropes, or scaffolds, never stoop, kneel, crouch, and crawl, and could only occasionally climb ramps and stairs. *Id.* Again, these findings were based upon Plaintiff's chronic low back pain; poor lumbar range of motion; poor bending; slightly limited kneeling; obesity; and sharp, shooting, stabbing pains down both legs. AR at 2624. Dr. Hassman opined that Plaintiff's "lumbar range of motion is extremely limited and prevents her from performing stooping." *Id.* Dr. Hassman further opined that Plaintiff was restricted in working around heights, moving machinery, and extremes in temperature, but not in her ability to work with or around chemicals, dust, fumes, gases, or excessive noise. *Id.*

## II.    STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). "Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (citations omitted) (alterations in original).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

1    as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

2    Where "the evidence can support either outcome, the court may not substitute its judgment

3    for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

4    1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

5    Moreover, the court may not focus on an isolated piece of supporting evidence, rather it

6    must consider the entirety of the record weighing both evidence that supports as well as

7    that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations

8    omitted).  Additionally, the Court will only review issues raised by Plaintiff in this cause

9    of action. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir.

10    2008).

11

12    **III.    ANALYSIS**

13          ***A.    The Five-Step Evaluation***

14          The Commissioner follows a five-step sequential evaluation process to assess

15    whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as

16    follows:  Step One asks is the claimant "doing substantial gainful activity[?]"  20 C.F.R. §

17    404.1520(a)(4)(i).  If yes, the claimant is not disabled.  Step Two considers if the claimant

18    has a "severe medically determinable physical or mental impairment[.]"  20 C.F.R. §

19    404.1520(a)(4)(ii).  If not, the claimant is not disabled.  Step Three determines whether the

20    claimant's impairments or combination thereof meet or equal an impairment listed in 20

21    C.F.R. Pt. 404, Subpt. P, App.1.  20 C.F.R. § 404.1520(a)(4)(iii).  If not, the claimant is

22    not disabled.  Step Four considers the claimant's residual functional capacity and past

23    relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If claimant can still do past relevant work,

24    then he or she is not disabled.  Step Five assesses the claimant's residual functional

25    capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If it is

26    determined that the claimant can make an adjustment to other work, then he or she is not

27    disabled. *Id.*

28          In the instant case, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since her alleged onset date of March 20, 2018.  AR at 1700.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: lumbar spine degenerative disc disease and anxiety disorder, depressive disorder, borderline personality disorder and posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c))."  *Id.*  At step three, the ALJ further found that "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  *Id.* at 1701.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except claimant can never climb ladders, ro[p]es or scaffolds, occasionally climb ramps and stairs, balance stoop, kneel, crouch and crawl, can work in an environment with occasional exposure to temp extremes, vibrations and work hazards[,] . . . can understand remember and apply simple and detailed but not involved instructions[,] can interact with the public coworkers and supervisors as long as interactions are occ[asional] and superficial, [and] can adapt to minor changes in a routine work setting."  *Id.* at 1703.  At step four, the ALJ found that Plaintiff "is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)."  *Id.* at 1711.  At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, 416.969a)."  AR at 1712.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.* at 1698, 1713.

### B.    *Medical Opinion Evidence*

Plaintiff asserts that "[t]he ALJ's rejection of Dr. Hassman's findings with relation to postural abilities is not based on substantial evidence, and her failure to even address changes of position is legally erroneous."  Pl.'s Opening Br. (Doc. 19) at 10.  The Court agrees with Plaintiff.

1

### 1. **Legal Standard**

Section 404.1520c, 20 C.F.R., governs the analysis of medical opinions for disability claims filed on or after March 27, 2017. "Under the revised regulations, 'there is not an inherent persuasiveness to evidence from [government consultants] over [a claimant's] own medical source(s), and vice versa.'"[6] *Woods v. Kijakazi*, 32 F.4th 785, 791 (9th Cir. 2022) (alterations in original) (quoting Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. at 5844)). Rather, medical opinions are evaluated pursuant to the factors set forth in Section 404.1520c(c)(1)–(5), with the most important factors being supportability and consistency. 20 C.F.R. § 404.1520c(c); *see also* 20 C.F.R. § 404.1520c(b)(2). "Consistency means the extent to which a medical opinion is consistent with the evidence from other medical sources and non medical sources in the claim." *Stiffler v. O'Malley*, 102 F.4th 1102, 1106 (9th Cir. 2024) (quoting *Woods*, 32 F.4th at 792). "Supportability focuses on whether 'a medical source supports a medical opinion by explaining the relevant objective medical evidence.'" *Id.* (quoting *Woods*, 32 F.4th at 791–92). The regulations specifically require the ALJ to explain how he or she considered supportability and consistency in evaluating medical opinions and making the disability determination. 20 C.F.R. § 404.1520c(b)(2). Additionally, the ALJ may, but is not required to, consider other factors such as the medical source's relationship with the claimant, the medical source's area of specialization, or "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. 404.1520c(c)(3)–(5).

### 2. **Analysis**

The ALJ's analysis of Dr. Hassman's opinion is as follows:

Consultative examiner Dr. Hassman opined in August 2021 that claimant

---

[6] The Ninth Circuit Court of Appeals has held that its previous "requirement that ALJs provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion . . . is . . . incompatible with the revised regulations. *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

could perform sedentary work, does not use an assistive device, can occasionally climb ramps and stairs, never perform any other postural function, and must avoid working around heights, moving machinery and temperature extremes. (Ex. 44F) the [sic] undersigned is not fully persuaded by this opinion. As while the postural limitations are supported by claimant's self report at the consultative examiner and her deferral of performance of these functions, it is inconsistent with the longitudinal evidence, which indicated her ability to bend and tie her shoes and display normal spinal range of motion. The undersigned finds that only occasional postural limitations are warranted, aside from the climbing of ladders, ropes or scaffolds. (Ex. 43F pg. 98, 105, 114, 121, 128, 136, 142[.])

AR at 1711. Defendant asserts that Plaintiff is incorrect in her suggestion that the ALJ seems to be referencing the April 2019 examination and opinion of Karen Lunda, M.S., P.T., which cannot provide substantial evidence to support the ALJ's rejection of stooping limitations. Def.'s Response (Doc. 21) at 9. Defendant urges that "[a]s the ALJ noted throughout her decision, the longitudinal record did not support limitations in excess of occasional postural with no climbing of ladders, ropes, or scaffolds." *Id.* (citations omitted). "Even under the new regulations, [however,] an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

As an initial matter, there is no suggestion anywhere in Dr. Hassman's report that Plaintiff deferred performance of any functions. *See* AR at 2618–25. Furthermore, the record does not support a finding that Dr. Hassman based her opinion solely on Plaintiff's own reports. Additionally, the specific pages cited by the ALJ which are in Plaintiff's treatment records from the Pain Institute of Southern Arizona, do not contain any reference to postural limitations, and relate to telemedicine appointments with the Nurse Practitioner who was primarily responsible for Plaintiff's pharmacotherapy medication checks. *See* AR at 2569 (Ex. 43F/98, Jan. 12, 2021, telemedicine appointment with NP Valenzuela); AR at 2576 (Ex. 43F/105, Dec. 1, 2020, telemedicine appointment with NP Troupe); AR at 2585 (Ex. 43F/114, Oct. 15, 2020, telemedicine appointment with NP Valenzuela); AR at 2592 (Ex. 43F/121, Sept. 16, 2020, telemedicine appointment with NP Valenzuela); AR

at 2599 (Ex. 43F/128, Aug. 18, 2020, telemedicine appointment with NP Valenzuela); AR
at 2607 (Ex. 43F/136, July 20, 2020, telemedicine appointment with NP Valenzuela); AR
at 2613 (Ex. 43F/142, June 16, 2020, telemedicine appointment with NP Valenzuela). As
such, the Court finds the ALJ's preferred reasons do not constitute substantial evidence to
reject Dr. Hassman's opinion. Furthermore, it is not for this Court to attempt to divine
what the ALJ was thinking. "Long-standing principles of administrative law require us to
review the ALJ's decision based on the reasoning and factual findings offered by the ALJ–
not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been
thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225–26 (9th Cir. 2009)
(citations omitted). The ALJ did not sufficiently explain why she rejected Dr. Hassman's
opinion, and the Court finds this constitutes legal error.

### C.    Remand

"'[T]he decision whether to remand the case for additional evidence or simply to
award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759,
763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand
for further administrative proceedings is appropriate if enhancement of the record would
be useful." *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v.
Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)). Conversely, remand for an award of benefits
is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the
> evidence; (2) there are no outstanding issues that must be resolved before a
> determination of disability can be made; and (3) it is clear from the record
> that the ALJ would be required to find the claimant disabled were such
> evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted). Where the test is met, "we will not remand
solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony
to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see
also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). "Even if those requirements are
met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v.*

*Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in assessing the medical opinion evidence. The Court has concerns that "[a]llowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). There are two issues, however, which tip this matter in favor of remand. First, Plaintiff requests reversal and remand for further proceedings. Pl.'s Opening Br. (Doc. 19) at 10. Second, based on the record, it is not clear to the Court that Plaintiff is disabled. This analysis requires reconsideration of the evidence in this case. As such, the Court recommends remand on an open record.

## IV.    CONCLUSION

Based on the foregoing, the Court finds the ALJ committed legal error in assessing the medical opinion evidence. Such error requires reversal and remand, and the Court will direct reanalysis on an open record.

## V.    RECOMMENDATION

For the reasons delineated above, the Magistrate Judge recommends that the District Judge enter an order REVERSING and REMANDING the Commissioner's decision for further consideration.

Pursuant to 28 U.S.C. § 636(b) and Rule 72(b)(2), Federal Rules of Civil Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). No replies shall be filed unless leave is granted from the District Judge. If objections are filed, the parties should use the following case number: **CV-23-0387-TUC-AMM**.

. . .

Failure to file timely objections to any factual or legal determination of the Magistrate Judge may result in waiver of the right of review.

Dated this 6th day of August, 2024.

_____

Eric J. Markovich
United States Magistrate Judge